UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 6:23-CR-00183-01 |
| | * | |
| VERSUS | * | JUDGE JOSEPH |
| | * | |
| BRENNAN JAMES COMEAUX | * | MAGISTRATE JUDGE WHITEHURST |

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS INDICTMENT

**INTRODUCTION**

By indictment, the government accuses Brennan Comeaux of possessing unregistered firearms in violation of 26 U.S.C. § 5861(d) (Count One) and receiving and possessing firearms unidentified by serial number in violation of 26 U.S.C. § 5861(i). ECF 1. Specifically, the government alleges that Mr. Comeaux built his own firearm suppressors, five in total, and did not register them or identify them by serial number as required by federal law. Mr. Comeaux is not a prohibited person prevented from possessing firearms under federal or state law.

Mr. Comeaux alleges that these statutes violate the Second Amendment on their face and as applied to him as that right has been interpreted by the United States Supreme Court in New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S. Ct. 2111 (June 23, 2022).

## LAW

Federal law prohibits the possession of certain firearms—statutorily defined to include silencers—unless such firearm is registered in the National Firearms Registration and Transfer Record (National Record). 26 U.S.C. § 5861(d). Additionally, federal law prohibits the receipt or possession of such firearms if they are not identified by a serial number. 26 U.S.C. § 5861(i). Thus, the National Firearms Act (NFA)—which regulates these types of firearms—does not impose a per se ban on these types of firearms, but instead imposes a $200 tax stamp each time regulated items are transferred and requires registration of the firearms with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF).

### A. __Bruen__'s sea change in Second Amendment jurisprudence.

The Second Amendment confers a second-class right no longer. Bruen, 142 S. Ct. at 2156. Bruen initiated a sea change in Second Amendment jurisprudence. In Bruen, the Supreme Court swept away the prior means-end scrutiny courts had been using in Second Amendment cases and replaced it with a test based on historical tradition. The Court said that firearm restrictions are now presumptively unlawful unless the government can "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." Bruen, 142 S. Ct. at 2126.

Thus, the standard for applying the Second Amendment now requires courts to do the following: first, the court must determine whether the Second Amendment's "plain text" covers an individual's conduct; if so, the Constitution presumptively "protects that conduct." Second, to rebut this presumptive protection, the government

must show that the restriction is "consistent with the Nation's historical tradition of firearm regulation." If the government cannot do so, the law is unconstitutional. <u>Bruen</u>, 142 S. Ct. at 2129–30.

## ARGUMENT

### A. Title 26, U.S.C. §§ 5861(d) and (i) burden the core Second Amendment right to possess firearms and thus are presumptively unlawful.

Applying <u>Bruen</u>'s framework to the case at bar, 26 U.S.C. §§ 5861(d) and (i) run afoul of the Second Amendment. First, the conduct those statutes regulate is the receipt and possession of firearms. The Second Amendment's plain text, which protects "the right of the people to keep and bear Arms," covers firearms possession. As the Court noted in <u>District of Columbia v. Heller</u>, 554 U.S. 570, 583 (2008), the Second Amendment's term "'[k]eep arms' was simply a common way of referring to possessing arms" at the time of ratification. The right to keep and bear arms applies to "all Americans." <u>Bruen</u>, 142 S. Ct. at 2156; <u>Heller</u>, 554 U.S. at 581. "[T]he people" protected by the Second Amendment "unambiguously refers to all members of the political community, not an unspecified subset." <u>Heller</u>, 554 U.S. at 580.

Because 26 U.S.C. §§ 5861(d) and (i) burden Mr. Comeaux's core Second Amendment right—his right to possess firearms—the government must show that the restriction is "consistent with the Nation's historical tradition of firearm regulation." <u>Bruen</u>, 142 S. Ct. at 2126.

**B. Title 26, U.S.C. § 5861(d) is unconstitutional because the government cannot show that the Nation has a historical tradition of requiring gun owners to register their firearms.**

Title 26, U.S.C. § 5861(d)—which prohibits the possession of unregistered firearms—is unconstitutional because the government cannot show that the Nation has a historical tradition of requiring gun owners to register their firearms.

First enacted in 1934, the NFA requires the government to "maintain a central registry of all firearms in the United States" known as the National Firearms Registration and Transfer Record. 26 U.S.C. § 5841(a); National Firearms Act of 1934, Pub. L. No. 730474, 48 Stat. 1236–1240. To register a firearm, a person must file a notice "set[ting] forth the name and address of the manufacturer, . . . the date of manufacture, the type, model, length of barrel, overall length, caliber, gauge or size, serial numbers, and other marks of identification." 27 C.F.R. § 479.103; see also 26 U.S.C. § 5841(a). The NFA makes it unlawful for anyone to receive or possess a firearm not registered to them in the National Record, 26 U.S.C. § 5861(d), and under the NFA a firearm includes "any silencer," 26 U.S.C. § 5845(a)(7).

Like with the statute at issue in Bruen, the NFA is directed at a "general societal problem" that has existed since the founding: to discourage the proliferation of firearms used in crimes. Bruen, 142 S. Ct. at 2131. Therefore, the government must identify a "well-established and representative" tradition of "distinctly similar" historical regulations mirroring the provisions of the NFA charged here. Id. at 2131, 2133.

4

Until the early 1900s, there were no requirements to register firearms with the federal or state government. By the time of the enactment of the NFA in 1934, only 11 states had passed registration statutes, with the first taking effect in 1911.[1] These laws post-date the enactment of the Second Amendment by 120 years. According to Bruen, such recent evidence is irrelevant to the Second Amendment analysis unless it "confirm[s]" what earlier sources have already established, which is not the case here. 142 S. Ct. at 2137. The government cannot identify any earlier sources demonstrating a historical tradition of requiring registration of firearms. Indeed, the Court in Bruen declined even to "address any of the 20th-century historical evidence brought to bear by respondents" because it "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." Id. at 2153 n.28. The same is true of the registration statutes cited above; they provide no evidence § 5861(d)'s registration requirement is consistent with the nation's historical tradition

---

[1] 1911 N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 2; 1913 Mich. Pub. Acts 472, An Act Providing for the Registration of the Purchasers of Guns, Pistols, Other Fire-arms and Silencers for Fire-arms and Providing a Penalty for Violation, § 1; 1917 Cal. Sess. Laws 221-225, An act relating to and regulating the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person § 7; 1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, § 5; 1931 Ill. Laws 453, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 4; 1933 Wyo. Sess. Laws 117, An Act Relating to the Registering and Recording of Certain Facts Concerning the Possession and Sale of Firearms by all Wholesalers, Retailers, Pawn Brokers, Dealers and Purchasers, Providing for the Inspection of Such Register, Making the Violation of the Provisions Hereof a Misdemeanor, and Providing a Penalty Therefor, ch. 101, §§ 1-4; 1933 S.D. Sess. Laws 245-47, An Act Relating to Machine Guns, and to Make Uniform the Law with Reference Thereto, ch. 206, §§ 1-8; 1931-1933 Wis. Sess. Laws 245-47, An Act . . . Relating to Machine Guns and to Make Uniform the Law with Reference Thereto, ch. 76, § 1, pt. 164.01 to 164.06; 1933 Haw. Sess. Laws 36-37, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 3; 1934 Va. Acts 137-39, An Act to define the term "machine gun"; to declare the use and possession of a machine gun for certain purposes a crime and to prescribe the punishment therefor, ch. 96, §§ 1-7.

of firearm regulation dating back to the enactment of the Second Amendment. See id. at 2137 (requiring evidence that a "governmental practice has been open, widespread, and unchallenged since the early days of the Republic").

Moreover, the registration statutes identified herein are at most "outliers." Bruen, 142 S. Ct. at 2153. Where only 11 of the then-48 states passed registration statutes by the mid-20th century, it is insufficient to show "a tradition" of such firearm regulation. Id. at 2142 ("doubting" that statutes from three of the original 13 colonies, equaling 23 percent, "could suffice to show a tradition" of firearm regulation). These isolated and post-dated registration statutes are therefore not "representative" in the way Bruen demands. Id. at 2133.

Finally, the early 1900s registration statutes were not directed to the type of firearms regulated here. Only one of the statutes—Michigan's 1913 regulation—required registration of silencers. See 1913 Mich. Pub. Acts 472, An Act Providing for the Registration of the Purchasers of Guns, Pistols, Other Fire-arms and Silencers for Fire-arms and Providing a Penalty for Violation, § 1. Even though silencers were available and in common use as of at least 1913, only one state had chosen to require their registration, which does not evince the "open, widespread, and unchallenged" history of regulation that Bruen demands. Bruen, 142 S. Ct. at 2137. 26 U.S.C. § 5861(d) is unconstitutional post-Bruen.

**C. Title 26, U.S.C. § 5861(i) is unconstitutional because the government cannot show a historical basis for requiring serial numbers on firearms or the criminalization of firearms without serial numbers.**

26 U.S.C. § 5861(i)—which prohibits the possession of firearms unidentified by serial number—similarly falls under <u>Bruen</u> because the government cannot establish a robust, historical tradition of requiring serial numbers—or any similar tracking mechanism—on firearms, let alone criminalizing the possession of firearms that lacked such serial numbers.

As with § 5861(d) and the statute at issue in <u>Bruen</u>, § 5861(i) is directed at "general societal problem[s]" that have existed since the founding: "crime, including crime involving stolen firearms, and assisting law enforcement in solving crime." <u>United States v. Randy Price</u>, No. 2:22-CR-00097, Dkt. No. 48, at *12 (S.D.W.V. Oct. 12, 2022) (discussing the "societal problems" addressed by 18 U.S.C. § 922(k), which prohibits possession of a firearm with an altered, obliterated, or removed serial number). "It is difficult to imagine that this societal problem did not exist at the founding. While firearms then were not the same as firearms today, there certainly were gun crimes that might have been more easily investigated if firearms had to be identifiable by a serial number or other mark." <u>Id.</u> Once again, the government must identify a robust tradition of "distinctly similar" historical regulations that were in existence at or around the time the Second Amendment was enshrined in the Constitution. <u>Bruen</u>, 142 S. Ct. at 2131, 2133. It cannot do so.

The <u>Price</u> court undertook a thorough review of the history of serial numbers. <u>Price</u>, No. 2:22-CR-00097, Dkt. No. 48, at *10-14. It found that "serial numbers were

not required, or even in common use, in 1791." <u>Id.</u> at *10. The first recorded serial numbers did not appear on firearms until 1865. <u>Id.</u> No jurisdiction required their use until the passage of the NFA in 1934. <u>Id.</u> Until the NFA, the <u>Price</u> court found no evidence of any regulations that "required firearm owners to keep an identifiable mark on their firearm and never change or remove that mark, with criminal penalties levied against violators." <u>Id.</u> at *9 n.3. The court concluded that "[t]he Government has presented no evidence, and the court is not aware of any, that any such [serial number] requirement existed in 1791." <u>Id.</u> at *12. Therefore, the <u>Price</u> court found that since parallel societal problems existed at the founding and were not addressed by means like a serial number requirement, "the challenged regulation is inconsistent with the Second Amendment." <u>Id.</u> (quoting <u>Bruen</u>, 142 S. Ct. at 2130).

Identical analysis is applicable here. Because the government cannot identify any distinctly similar requirement from the founding era punishing the possession of firearms that did not bear serial numbers, application of § 5861(i) to Mr. Comeaux's conduct of possessing silencers that did not bear serial numbers violates the Second Amendment.

<div style="margin-left:2em">

RESPECTFULLY SUBMITTED,

REBECCA L. HUDSMITH
FEDERAL PUBLIC DEFENDER FOR THE
MIDDLE & WESTERN DISTRICTS OF LOUISIANA

BY:   **S/ AARON A. ADAMS**
Louisiana Bar No. 37006
Assistant Federal Public Defender
102 Versailles Blvd., Suite 816
Lafayette, Louisiana 70501
(337)262-6336 (Phone) (337)262-6605 (Fax)

</div>

8

Counsel for Brennan James Comeaux