IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | * CRIMINAL NO. 6:23-CR-00183-01 |
| | * |
| VERSUS | * DISTRICT JUDGE JOSEPH |
| | * |
| BRENNAN JAMES COMEAUX | * MAGISTRATE JUDGE WHITEHURST |

**UNITED STATES' MEMORANDUM OF LAW IN OPPOSITION
TO THE DEFENDANT'S MOTION TO DISMISS INDICTMENT**

## I.  INTRODUCTION

NOW COMES the United States of America, through undersigned counsel, who respectfully opposes the motion to dismiss the indictment filed by the defendant, Brennan James Comeaux, which challenges the constitutionality of the possession unregistered firearms and possessing firearms unidentified by serial number statutes: Title 26, United States Code, Section 5861(d) and (i). ECF No. 25 and 25-1. The defendant's memorandum of law patterns its analysis, at least in part, from *United States v. Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309 (S.D. Miss. June 28, 2023)[1], a decision which is neither binding on this Court nor was correctly decided in light of the Supreme Court's holding in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). ECF No. 48-1.

---

[1] The Solicitor General of the United States has authorized an appeal in *Bullock*, and that appeal is currently pending in the U.S. Fifth Circuit (docket number 23-60408).

**Page 1 of 11**

In *Bruen*, the Supreme Court held that "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30. However, Defendant's argument is without merit. The Supreme Court has held that regulations of silencers fall outside the Second Amendment's ambit; *Bruen* did not alter that precedent. This Court should deny defendant's motion.

## II. BACKGROUND

On August 16, 2023, a federal grand jury returned a two-count indictment charging the defendant with violating Title 26 United States Code Section 5861(d) for possessing an unregistered firearm and Section 5861(i) for possessing a firearm unidentified by serial number. ECF No. 1. The defendant was found in possession of numerous silencers[2] and silencer parts that were unregistered with the National Firearms Registration and Transfer Records on June 2, 2022, after Iberia Parish Sheriff Deputies executed a search warrant on his residence.

The state issued search warrant was based on multiple neighbors of the defendant calling 911 out of fear of the defendant. The defendant's neighbors claimed he was discharging firearms in their direction while yelling at them. After the defendant was interviewed by law enforcement, he admitted to doing so in an attempt

---

[2] Title 18 U.S.C. § 921(a)(24), defines "firearm silencer" as "any device for silencing, muffling, or diminishing the report of a portable firearm. Including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication."

to scare them. Among the silencers recovered pursuant to the search, two firearm manuals, "Full Auto Volume One AR-15 Modification Manual," and "AR-15 M16 Lighting Link Manual" were found; and a white dry erase board with the words, "If you live on the west side of me you need to die today….because you are too fucking noise punk, and your bitch." The neighbors who called 911 lived to the west of the defendant.

### III. LAW AND ARGUMENTS

The Second Amendment to the Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. However, "[l]ike most rights, the right secured by the Second Amendment is not unlimited; it does not allow every person "to keep and carry any weapons whatsoever in any manner whatsoever and for whatever purpose." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). In evaluating what limitations Congress can impose on citizens' Second Amendment rights, the Supreme Court has directed courts to ask two questions: (1) whether "the Second Amendment's plain text covers an individual's conduct," *Bruen*, 142 S. Ct. at 2129–30, and (2) if not, whether "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*.

The Court should deny defendant's motion to dismiss for two reasons. First, the regulation of an individual's possession of a silencer does not violate the Second Amendment. Since silencers are not arms, but rather an accessory, they are not protected by the Second Amendment. *United States v. Cox*, 906 F.3d 1170, 1186 (10th

Cir. 2018). A silencer is not a 'weapon of offence or an armour of defence' because it cannot on its own cause any harm and is not useful independent of its attachment to a firearm. *United States v. Hasson*, 2019 WL 4573424, at *4(D. Md. Sept. 20, 2019), aff'd, 26 F.4th 610 (4th Cir. 2022). Consequently, "silencers are not bearable arms within the scope of the Second Amendment even in light of Bruen or its progeny. The Defendant's motion fails the first step of the Bruen analysis—that the plain text of the Second Amendment includes silencers." *United States v. Peterson*, No. CR 22-231, 2023 WL 5383664, at *2 (E.D. La. Aug. 21, 2023). Therefore, his motion must be dismissed.

Second, even if *Bruen* applied, Sections 5861(d) and (i) would satisfy its historical analogy test as the Second Amendment's plain text and historical context indicate that NFA's restrictions on silencers are well in line with two historical traditions in this country: first, the historical tradition of regulating "dangerous and unusual weapons" and, second, the historical tradition of regulation commerce in firearms.

    A.    ***Bruen* did not call into question possession of silencers and, therefore, does not apply to this case.**

The Second Amendment to the United States Constitution states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. However, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008).

The Second Amendment applies to "bearable arms." *Heller*, 554 U.S. at 582.

Heller, 554 U.S. at 582. According to *Heller*, "the most natural reading of [the phrase] 'keep Arms' in the Second Amendment is to 'have weapons.'" *Id.* Although that protection might extend to things necessary to use arms, such as certain magazines and ammunition, or even access to firing ranges—see, e.g., *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)—it does not automatically apply to anything that can be attached to a firearm, but which is not otherwise necessary to render the firearm operable.

A silencer is not necessary to make a firearm operable; rather, it is exclusively a means to reduce sound omitted from an already operable firearm. "A silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence')." *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018); see also *United States v. Hasson*, 2019 WL 4573424, at *3-5 (D. MD. Sept. 20, 2019), aff'd, 26 F.4th 610 (4th Cir. 2022) ("Silencers generally have no use independent of their attachment to a gun. They do not fire bullets on their own and do not contain a slide, trigger, firing pin, cartridge case, barrel, primer, or gunpowder.").

Nothing in *Bruen* suggests that silencers fall within the meaning of "arms" under the Second Amendment. *Bruen* spoke of "firearm" regulations, not the regulation of firearm accessories. 142 S. Ct. at 2126, 2131-32. *Bruen* did not directly address, or somehow constitutionally shield, and individual's right to possess accessories that merely quiet an otherwise bearable arm. See, e.g., *United States v. Stepp-Zafft*, 733 F. App'x 327, 329–30 (8th Cir. 2018) (on plain error review, finding no plain error where district court failed to dismiss unregistered silencer charge on

Second Amendment grounds); *United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009) (holding that silencers are not protected by the Second Amendment); *United States v. Grey*, Case No. CR-18-00412-CAS-1, 2018 WL 4403979, at *13 (N.D. Cal. Sept. 13, 2018) (following McCartney's holding to deny motion to dismiss unregistered silencer charge on Second Amendment grounds); *United States v. Garnett*, 2008 WL 2796098, at *4–5 (E.D. Mich. 2008) (finding that nothing in *Heller* "casts doubt" on the constitutionality of the NFA's regulation of silencers).

  **B.** **Even if *Bruen* applied in this case, Section 5861(d) and (i) would survive its two-pronged test.**

Even if *Bruen* required this Court to consider Section 5861(d) and (i) constitutionality afresh, the defendant's arguments would still not prevail. *Bruen* "reiterate[d]" the "standard for applying the Second Amendment." 142 S. Ct. at 2129. First, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129-30. Second, when a regulation burdens such presumptively protected conduct, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. Here, the Second Amendment's plain text and historical context do not prevent Congress from regulating possession of silencers. Moreover, even if the Second Amendment's plain text applied to the charged conduct in this case, Sections 5861(d) and (i) are consistent with the Nation's historical tradition of firearm regulation.

    **i.** *The Second Amendment's plain text and historical context indicate that silencers can be regulated.*

First, *Heller* recognized (and Justice Kavanaugh's concurrence in *Bruen* echoed) the "historical tradition of prohibiting the carrying of dangerous and unusual weapons." 554 U.S. at 627. In the case of silencers, these firearms accessories were perceived as dangerous almost immediately after their invention, and they were quickly used to facilitate crimes. See Robert J. Spitzer, Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers, 83 L. & Contemp. Probs. 231, 246-49 (2020). The silencer was invented in the early 1900s and patented in 1908. *Id*. at 246. "Objections to civilian use of silencers appeared almost immediately." Id. By 1909, Maine became the first state to ban the sale or possession of silencers, and New Jersey followed two years later. *Id*. at 247. The primary concern underlying the unregulated possession of silencers was crime that would be committed by both typical criminals and hunters/poachers. *Id*. "From 1909 to 1936, at least fifteen states enacted silencer restrictions," including Arizona, Louisiana, Michigan, North Carolina, Pennsylvania, and Wyoming. *Id*. at 248, n.123. Ultimately, the inventor of the silencer and his company "discontinued manufacturing silencers because of the popular impression that this invention was an aid to crime." *Id*. at 248 n.125 (Maximum Bans Gun Silencer, N.Y. TIMES, May 8, 1930, at 27). In short, under *Heller*, even assuming that silencers are "arms," within the meaning of the Second Amendment, they remain unusually dangerous and thus fall permissibly within this nation's historical tradition of regulation.

*Bruen* did not undermine *Heller's* recognition of the historical tradition of regulating "dangerous or unusual weapons"—in fact, it re-emphasized it. See *Bruen*,

142 S. Ct. at 2143-44. Instead, *Bruen* focused on handguns, which it described as "indisputabl[y] in common use for self-defense today." *Id.* at 2143. But silencers are not intended for self-defense, thus underscoring the particular danger they represent. See *United States v. Tagg*, 572 F.3d 1320, 1326 (11th Cir. 2009) (rejecting defendant's Second Amendment-based challenge to constitutionality of NFA and finding that "pipe bombs are not typically possessed by law-abiding citizens for lawful purposes" and therefore fall within "the historical tradition of prohibiting the carrying of dangerous and unusual weapons"); *supra* at 6 (collecting cases holding that because machineguns are "dangerous and unusual," they fall outside the Second Amendment's scope).

### ii. The Second Amendment's plain text and historical context indicate that possession of silencers can be regulated.

The NFA's registration and taxation requirements fall into another national historical tradition: the regulation of commerce surrounding firearms.[3] "[C]olonial governments substantially controlled the firearms trade." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017). For example, "a 1652 New York law outlawed illegal trading of guns, gun powder, and lead by private individuals." Robert J. Spitzer, Gun Law History in the United States and Second Amendment Rights, 80 Law & Contemp. Probs. 55, 76 (2017). "A 1631 Virginia law required the recording not only of all new arrivals to the colony, but also 'of arms and munitions.'" *Id.* In the

---

[3] Such administrative regulations cannot be said to "infringe" on the right to keep and bear arms, as prohibited by the Second Amendment. As already discussed, silencers are not "arms," within the meaning of the Second Amendment. In addition, administrative burdens of the type represented by the NFA fall far short of disarming law-abiding citizens and therefore cannot be said to "infringe" on their Second Amendment right. See Webster's 1828 American Dictionary of the English Language (defining "infringe" as "[t]o break; to violate; to transgress" and "[t]o destroy or hinder").

early 17th century, Connecticut banned residents from selling firearms outside the colony. Teixeira, 873 F.3d at 685. Virginia provided that people were at "liberty to sell arms and ammunition to any of his majesties loyal subjects inhabiting this colony." *Id.* at 685 n.18. And other colonial government "controlled the conditions of trade" in firearms. Id. at 85.

States continued to enact laws governing "the manufacture, sale [and] transport" of guns and ammunition in the 18th and 19th centuries. Id. at 74. For example, in 1814, "Massachusetts required that all musket and pistol barrels manufactured in the state be first tested," and it appointed a state inspector "to oversee or conduct the testing." Id. Likewise, in 1820, "New Hampshire created and appointed state gunpowder inspectors to examine every storage and manufacturing site." *Id.* Meanwhile, "[t]wentieth century laws extended safety regulations pertaining to gunpowder and other explosives." *Id.*

Like these early laws, the NFA's registration and taxation requirements for silencers do not prohibit possessing or even transferring them. Instead, the statute at issue merely imposes record-keeping and attendant payment requirements to document the items[4] to help ensure that they can be traced (e.g., when they are believed to have been used in a crime). Although the NFA may not be identical to the

---

[4]Under the NFA, a manufacturer, importer, or dealer of a covered firearm must register with ATF as a special occupational taxpayer (SOT) on first engaging in the business; pay an occupational excise tax; and register each firearm with ATF in the National Firearms Registration and Transfer Record (NFRTR). The "maker" of a covered firearm, which his defined to mean a person who manufactures, puts together, alters, or otherwise produces a firearm, must pay a making tax of $200 for each firearm made. No person may make a firearm unless an application is filed with ATF. The maker, or subsequent transferor, may thereafter transfer the weapon only pursuant to the NFA, which requires that the maker or transferor identify itself, the firearm, and the transferee, and apply for and receive approval from ATF. The makers or transferor must then pay a transfer tax of $200 for each firearm transferred. 26 U.S.C. § 5811.

above-referenced historical statutes, *Bruen* explained that the government need only identify a "historical analogue, not a historical twin." 142 S. Ct. at 2133. In this case, the practice of the colonies and the United States of regulating commerce in firearms provides a sufficient historical analogue to the NFA.

Moreover, *Bruen* expressly did not disturb the "shall issue" licensing laws that exist in 43 states. 142 S. Ct. at 2138 n.9. And Justice Kavanaugh's concurrence emphasized that state can constitutionally require license applicants to "undergo fingerprinting, a background check, a mental health records check and training in firearms handling and in law regarding the use of force, among other possible requirements." *Id.* at 2162. A registration scheme for silencers is no more burdensome than the kind of requirements that the Supreme Court already has found to be constitutionally unproblematic.

The Supreme Court's authoritative interpretation of the Second Amendment's plain text further confirms this view. *Heller* explained that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. *Heller* indicated that "prohibitions on carrying concealed weapons" were lawful. *Id.* It said that the Second Amendment applies only to "the sorts of weapons" that were "in common use at the time." *Id.* at 627 (quotations omitted). And the Court said that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as

schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. Thus, in conducting its "textual analysis" of the Second Amendment, there is no inconsistency between its plain text and laws prohibiting possessing silencers and registration requirements for silencers.

## IV. CONCLUSION

Accordingly, and for the reasons set forth above, this Court should deny the defendant's motion to dismiss the indictment. *Bruen* did not call into question the regulation or possession of silencers. Instead, *Bruen* concerned firearm regulations aimed at "law abiding citizens," not a statute whose own elements limit itself to regulating firearm accessories or firearms that are unusual and extraordinarily dangerous. But even if *Bruen* applied, Sections 5861(d) and (i) would still satisfy its historical analogy test because the Second Amendment's plain text and historical context indicate that silencers can be regulated, and the Nation's historical tradition confirms that silencers can be regulated.

Respectfully submitted,

BRANDON B. BROWN
United States Attorney

*/s/ Casey Richmond*
CASEY RICHMOND (AR Bar No. 2018038)
Assistant United States Attorney
800 Lafayette Street, Suite 2200
Lafayette, Louisiana 70501
Phone: 337-262-6668
Email: casey.richmond@usdoj.gov